Filed 12/8/21  P. v. Vorreiter CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C091942 |
| Plaintiff and Respondent, | (Super. Ct. No. 18F7755) |
| v. | |
| KENNETH KARL VORREITER, | |
| Defendant and Appellant. | |

A jury found defendant Kenneth Karl Vorreiter guilty of second degree murder, multiple counts of corporal injury to a spouse, and possession of methamphetamine after his wife died following a brutal beating.  On appeal, defendant argues (1) the trial court erred by admitting evidence of defendant's prior domestic abuse against his wife and ex-wife; (2) his counsel was constitutionally ineffective for failing to object to the prosecutor's description of voluntary manslaughter at closing; (3) the jury instructions on implied malice for second degree murder failed to address foreseeability; and (4) the jury should have been permitted to consider defendant's voluntary intoxication as it related to whether he acted in the heat of passion.  Finding no merit to defendant's contentions, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

A.      *The facts*

In November 2018, defendant had been married to the victim, Lori, for nearly 11 years.  They were both heavy drinkers, drinking alcohol daily.  Defendant had been expressing to his longtime friend, C.B., that he was frustrated with Lori.  At noon on November 6, 2018, defendant called C.B. and said, "I think I fucked up."  When C.B. asked why, defendant went silent, held his breath, and said, "I hit her."  He admitted that Lori had "pushed [his] buttons" and he "couldn't . . . take it anymore."  Defendant told C.B. that Lori was sleeping and that he thought she was okay.  He then said that she was awake and that he would call C.B. back.  However, C.B. missed defendant's calls at 12:31 p.m. and at 1:27 p.m.

At 3:26 p.m., defendant called C.B. again and she picked up.  Defendant said, "I can't believe this is happening. . . .  I don't know what to do. . . .  I don't think she's breathing. . . .  I don't know if she's faking it or not."  C.B. asked if Lori was breathing, and he responded that she was "gurgling" but he could not tell if she was breathing.  C.B. told defendant to call 911.

Defendant hung up and called back at 4:07 p.m.  By that time, he was going into "panic mode."  C.B. again told defendant to call 911 but did not want to hang up because defendant was saying things such as, "You know if this looks really bad, my life is over."  At some point defendant said he was going to kill Lori and kill himself.  Defendant told C.B. that Lori felt warm and that he had already tried CPR.  C.B. repeatedly told defendant to call 911, and finally insisted he at least check Lori's pulse.  Defendant said he could not find it and yelled at her to wake up.  He told C.B. that a fly crawled out of her nose.  Defendant continued to talk about "how fucked he was gonna be and how bad it was gonna look" and repeated that he wanted to kill himself.

While keeping defendant on the phone, C.B. drove to the Sonoma County Sheriff's Department, arriving at approximately 5:00 p.m.  She walked in distressed and

2

mouthed, "Help me." The officers coached C.B. through her conversation with defendant, which they recorded on a body camera. She continued to urge defendant to call 911, but defendant, who had five puppies on his lap, insisted he first needed to find a missing sixth puppy. Defendant said that Lori had been suffering from daily headaches for the past month, went to bed, and as far as he knew, she had fallen asleep. He said her face was "cold as hell." He said, "[T]hat could be my fault," and pleaded for Lori to wake up. C.B. offered to call 911 for defendant, but he responded, "No, no, no." After some searching, defendant stated that he found his landline phone, and C.B. again insisted he call 911. Defendant responded, "Maybe I'll just do something else." He was crying, and said, "I'm going to prison." C.B. again told defendant to call 911, and when he was unable to work his phone, and then unable to do a three-way call, C.B. offered again to call 911 for him, and he told her to "[j]ust do it."

With defendant still on the line, and at the officers' instruction, C.B. called the Shasta County Sheriff's Department, that the Sonoma County Sheriff's Department had already contacted, and that set up a staging area near defendant's house. Defendant told them over the three-way call that his wife was ill and not breathing. An officer went to defendant's home and handcuffed defendant.

Sheriff's deputies entered defendant's home and found Lori lying on her back on the bed. She was covered by a blanket, her mouth was open, her skin was cold and pale, and she did not have a pulse. She was pronounced dead shortly thereafter. Further examination of her body revealed bruising on the right side of her face and jaw and red discoloration on her left cheek. She also had a large "blue-ish/purple" bruise above her right breast and smaller bruises on the left side of her abdomen. Her left eye showed small petechial hemorrhages. By 1:30 a.m., her right arm was stiff with rigor mortis and she had lividity stains on her back and lower body.

A forensic pathologist performed an autopsy of Lori. She opined that a large bruise across the left side of Lori's face looked like finger marks. Aside from the injuries

3

observed by the officers, the pathologist found tears on the inside of Lori's lip and bruising on her lip and arms. Lori also had a scar on her head consistent with a craniotomy she underwent in 2010 to surgically evacuate an acute subdural hematoma.[1] The pathologist determined that the cause of death was an acute subdural hematoma due to blunt force head trauma. Had Lori gone to the hospital, the hematoma could have been evacuated in time to relieve the pressure caused by the blood accumulation in her brain. Lori's chronic alcoholism was also a contributing factor to her death because it thinned her blood. Her blood-alcohol level was at a potentially lethal level when she died, but the pathologist still found that she would not have died without the hematoma.

Defendant was interviewed at the sheriff's department. When describing the day, defendant first said he was working in his shop and heard Lori yelling at their dogs. When he came back in the house a half an hour or an hour later, she "looked weird." He tried to wake her up, but she did not respond. She was "cold in the face." Defendant did not know what to do, so he called his friend C.B. He stated that he and Lori had some arguments that day. He explained that earlier that day Lori said something to him, and he responded, "You know your dad would take [you] behind the . . . barn and paddle your ass." She responded, "Well your dad's a fuckin' rapist," which "pissed [him] off." He "didn't know whether to push her," and said, "I don't know what I did exactly." Defendant went to the shop, and when he saw her again she was white. He said she bruised very easily.

Defendant then admitted that he "socked her . . . or hit her or somethin" but that he did not remember much about the last two days. He said they got into an argument and he was "pissed," and that he may have hit her in the face. Although she "taunted [him] some more," defendant said he did not touch her anymore after that. When asked about

---

[1] A subdural hematoma occurs when blood accumulates between the skull and the membrane that protects the brain and is typically caused by blunt force trauma.

4

her injuries, defendant said that Lori was always falling down. He said the big bruise on her chest may have been from the chest compressions he performed on her, and the other bruises were from their dogs. Defendant explained that he did not call 911 because he was worried that "something might have happened" because he hit her in the face. He insisted that he did not strangle her. However, he volunteered that at some point he remembers thinking, "I hit her," and that if he was going to jail for putting his hands on her, he was going to make it something major, not a minor thing. Defendant said he was trying to get Lori to move out of the house because "[i]t's constant bullshit." Just under one gram of methamphetamine was found inside defendant's wallet.

A silent DVR recording was recovered from inside defendant's house. The recording showed that at approximately 4:00 a.m. on November 6, 2018, Lori was drinking whiskey. Defendant was also seen drinking whiskey just after 8:00 that morning. At 6:51 a.m., defendant and Lori appeared to argue and defendant "threw his right elbow," hitting her on the right side and almost knocking her over as she walked outside. Lori walked in and out of the house repeatedly until 11:45 a.m., when defendant punched her five or six times in the head. Immediately thereafter, Lori held her head. At 1:00 p.m., defendant approached Lori as she was lying on a chaise lounge and pulled her off of it by her feet. When she landed on the floor, defendant stomped on her, likely in the chest area, and pushed her back into the chaise lounge. Lori smoked a cigarette and then walked into the master bedroom and was not seen again in the video.

After Lori went into the bedroom and before sheriff's deputies arrived at approximately 6:00 p.m., defendant made 17 trips between the bedroom and the rest of the house. Defendant lay on the lounge chair between 1:31 p.m. and 3:25 p.m., at which point he called C.B. to tell her Lori was not breathing. A sheriff's detective watched the DVR recording from the entire week preceding Lori's death, and never saw Lori hit herself or fall down without being pushed or hit. She also never hits defendant but is seen cowering near him and covering herself in protection.

5

B.    *The verdict and sentencing*

The jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a)), eight counts of corporal injury to a spouse (Pen. Code, § 273.5, subd. (a)), and misdemeanor possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)).  The trial court sentenced defendant to an indeterminate term of 15 years to life in prison for the murder, plus three years consecutive for one count of corporal injury to a spouse, and one year concurrent for possession.  The trial court stayed the sentences for the remaining seven counts of corporal injury pursuant to Penal Code section 654.

DISCUSSION

I

*Prior Incidents of Domestic Violence*

Defendant argues that admitting evidence of (1) a head injury suffered by Lori in 2010 and (2) multiple acts of domestic violence defendant committed against his prior wife between 1990 and 2005 was an abuse of discretion because, with respect to both pieces of evidence, their probative value was outweighed by the probability that their admission would create a substantial danger of undue prejudice, and the trial court's errors in admitting the evidence were not harmless.  We conclude the trial court did not abuse its discretion and thus need not address the harmless error question.

A.    *Additional procedural history*

Before trial, the parties disputed the admissibility of two pieces of evidence involving defendant's prior acts of domestic violence.  First, the trial court considered evidence that one evening in 2010, the police responded to a call at Lori and defendant's home, and found Lori nonresponsive, with bruises and abrasions all over her body.  At the hospital, Lori underwent surgery for a subdural hematoma.  The doctor at the time observed signs of assault injuries.  The trial court found this evidence admissible under

6

Evidence Code section 1109[2] for propensity, and under section 1101, subdivision (b) as relevant to defendant's intent, knowledge, and motive. In reaching this ruling, the trial court balanced the probative value of the evidence against potential prejudice and found the evidence admissible under section 352. The trial court next considered evidence that defendant was increasingly violent with his ex-wife of 15 years, L.L., particularly when he would drink and use drugs. It found that although defendant's abuse of L.L. took place over 10 years ago, the evidence was still admissible as propensity evidence in the interest of justice, under section 1109, subdivision (f). It further admitted the evidence under section 1101, subdivision (b) for intent, knowledge, motive, and absence of mistake or accident, and reasoned that section 352 did not bar its admissibility.

At trial, with respect to the 2010 incident, an officer with the Santa Rosa Police Department testified that on December 6, 2010, he responded to a call to assist fire department personnel with a fall victim. He recognized the address because a few months prior he had received a 911 call from that home that disconnected. At that time, he went to the home and found Lori with bruises covering both of her arms. Lori told him the 911 call had been a misdial. On December 6, when the officer arrived at the home again, he saw Lori was nonresponsive, with injuries on her body and undergoing treatment by medical personnel. Defendant also was present and had been drinking. He told the officer that Lori was an alcoholic who frequently trips and falls. At the emergency room, the officer saw bruises and abrasions all over Lori's body and saw that her upper lip was swollen. The emergency room trauma surgeon who examined Lori observed a large subdural hematoma on the left side of her head. She said the injury could be consistent with a fall or with an assault. Lori's neurosurgeon evacuated her

---

[2]     Undesignated statutory references are to the Evidence Code.

hematoma in emergency surgery, saving her life. The officer later followed up with Lori, who said that she tripped and fell that day and could remember nothing else.

L.L., defendant's ex-wife, also testified. She lived with defendant on and off for approximately 11 years. Years into their relationship, defendant became violent with L.L., with his violence triggered by drinking alcohol. He gave her a black eye a few times, and the police were involved on multiple occasions. Once, when L.L. came home from work, she found defendant "beyond drunk and belligerent." He blocked her in a closet, and started to come after her. L.L. escaped from the closet and went to the kitchen, where she sat down on a chair with casters. Defendant grabbed the chair and rolled it across the kitchen so hard that she hit multiple things and landed backwards with the base of her skull hitting the oven door handle, causing her injury. She went to court but ultimately dropped the charges because she and defendant were "kind of communicating." There were "quite a few" incidents of violence with defendant when they lived together. She finally moved out when Lori moved in.

B.      *Analysis*

In general, evidence of a person's character, habit, or custom is inadmissible to prove that person's conduct on a specific occasion. (§ 1101, subd. (a).) However, evidence that a person committed a prior crime or other bad act may be admissible when offered to prove something *other than* his or her disposition to commit such an act, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (§ 1101, subd. (b).) Admission of evidence under section 1101, subdivision (b) is subject to the balancing of its probative value against its prejudicial effect under section 352. (*People v. Kerley* (2018) 23 Cal.App.5th 513, 534.)

Further, in a case like this one involving domestic violence, evidence that the defendant committed other uncharged acts of domestic violence is admissible to show the defendant has a propensity to commit such acts, unless the evidence is precluded under section 352. (§ 1109, subd. (a)(1); *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232.)

8

Where the uncharged act occurred more than 10 years before the charged offense, the uncharged act is admissible under section 1109 only after the trial court determines that its admission is in the interest of justice.  (§ 1109, subd. (e).)

Under section 352, trial courts have "discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice."  (*People v. Mendoza* (2007) 42 Cal.4th 686, 699.) "In conducting the careful weighing process to determine whether propensity evidence is admissible under section 352, trial courts 'must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . .'  [Citation.]"  (*People v. Kerley, supra*, 23 Cal.App.5th at p. 535, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

"The record must affirmatively show that the trial judge did in fact weigh prejudice against probative value, but no more is required.  [Citation.]  We review the trial court's exercise of discretion in admitting evidence under section 352 for abuse and will not disturb the court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'  [Citation.]"  (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.)

### 1.    *2010 attack and injury on Lori*

Defendant challenges the trial court's ruling admitting evidence of Lori's 2010 injury, arguing the court abused its discretion when balancing its probative value against its prejudicial effect under section 352.  We find no abuse of discretion.

The jury in this case was tasked with deciding whether defendant committed second degree murder, which requires malice aforethought; voluntary manslaughter,

which is killing in the heat of passion; or involuntary manslaughter, which requires defendant's criminal negligence. The 2010 incident revealed that Lori suffered the same injuries (a subdural hematoma with bruises all over her body) under similar circumstances (while defendant drank alcohol at home) as the injuries suffered in this case. The jury could infer from this evidence that defendant did not suddenly react in response to provocation, or with mere criminal negligence, but rather, consistent with a prior pattern of behavior that indicates malice. (*People v. Brown, supra*, 192 Cal.App.4th at p. 1237 ["A defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder"].)

The similarity between the incidents also is relevant to motive and intent, as it evinces a possible desire to terrorize and control his spouse. The 2010 incident was further probative as to defendant's knowledge, as it showed defendant was aware that when Lori had a previous head injury, she incurred a subdermal hematoma requiring emergency, life-saving surgery. This is relevant to whether defendant knew the likely consequences of injuring Lori's head and then leaving her in the bedroom for hours without seeking medical care. This was helpful for the jury to decide, with respect to voluntary manslaughter, whether defendant intentionally failed to act, knowing his failure to act was dangerous to human life.

Evidence of the 2010 incident also was not unduly prejudicial under section 352. It was unlikely that the jury would convict defendant in this case to punish him for his 2010 actions. Although defendant was not charged with or convicted of a crime based on the 2010 incident, there was minimal risk the jury would be misled into assuming, without sufficient evidence, that defendant injured Lori in 2010. Indeed, the jury was specifically instructed that it may only consider evidence of the uncharged domestic violence if the People proved by a preponderance of the evidence that defendant committed the act. The jury was therefore left to determine, based on the evidence presented, and with the proper standard of proof in mind, whether defendant committed

10

the prior act. Further, the 2010 event was not more inflammatory than defendant's offense in this case. Lori's injuries in 2010 and the circumstances under which they occurred were very similar to the present offense. But in this case, the jury also viewed video of defendant punching Lori in the head multiple times, dragging her, and stomping on her, and then heard defendant repeatedly acknowledge Lori was in dire medical condition, while refusing to call 911 in an effort to avoid blame. Lori died as a result. In view of all the direct, viscerally impactful evidence against defendant in this case, a jury would not likely become inflamed and concerned with punishing defendant for a more remote version of a similar crime.

The evidence also did not require undue consumption of time, as it was presented relatively briefly through three witnesses: the police officer, emergency room trauma surgeon, and neurosurgeon. Within the context of a two- to three-week trial, and the five- to six-week trial estimate made by the parties, this evidence did not take up a significant amount of time, and certainly did not constitute a "mini-trial," as defendant contends. We find no abuse of the trial court's discretion.

### 2. *Prior abuse of defendant's former wife*

We similarly conclude that L.L.'s testimony regarding defendant's abuse was highly probative and not unduly prejudicial. Defendant's abuse of L.L. took place more than 10 years ago, and thus was presumptively inadmissible unless it served "the interest of justice." (§ 1109, subd. (e).) "Subdivision (e) establishes a presumption that conduct more than 10 years prior to the current offense is inadmissible . . . . [I]t sets a threshold of presumed inadmissibility, not the outer limit of admissibility." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 539.) The subdivision requires a "more rigorous standard of admissibility for remote priors," but the " 'interest of justice' " analysis does not "necessitate[ ] an inquiry different in kind from that involved in a determination under section 352"; rather, it simply calls for the same analysis to be exercised with a higher degree of scrutiny. (*Johnson, supra*, at p. 539.) To the extent a higher degree of scrutiny

is called for, the probative value of the evidence must weigh more heavily than it does under a section 352 analysis.  (*Johnson*, at p. 539.)

L.L.'s testimony was highly probative, as it established that defendant regularly drank alcohol and became violent with her (his then-wife), which is a pattern of behavior similar to the charged crime.  Indeed, the specific incident described by L.L. is analogous to this case, as defendant drank alcohol and pushed his spouse with such force that she hit her head, sustaining injuries.  Further, defendant's prior abuse of his wife is relevant to whether defendant hurt Lori because he was provoked in the heat of passion, or instead harbored actual malice as a chronic abuser.

Further, although L.L. recounted abuse that occurred more than 10 years before trial, her testimony was not unduly prejudicial.  The events she described were less egregious than the facts of this case, and thus the jury would not likely want to punish defendant for his prior abuse.  L.L. also was the only witness to present evidence on this issue, testifying briefly and without needless inflammatory elaboration.  It also was not unduly cumulative, as it was the only evidence presented that established defendant's consistent physical abuse of a spouse.  In sum, the trial court did not abuse its discretion in admitting this evidence.

II

*Ineffective Assistance of Counsel*

Defendant next argues that the prosecutor incorrectly stated the standard for a heat of passion defense during closing argument, thereby committing prosecutorial misconduct.  As defense counsel did not object to the prosecutor's statement at trial, defendant concedes his claim was forfeited but argues that his counsel was constitutionally ineffective for failing to object.

At closing, the prosecutor explained that defendant would argue for voluntary or involuntary manslaughter, but that there were "glaring problems" with both versions. With respect to voluntary manslaughter, she said:  "The provocation has to be such that

12

an average person would have done the same thing.  It's not something needed to make up some standards.  It's that an average person would have acted that way.  That knocks out manslaughter."  Defense counsel did not object.

At the outset, we agree that defendant's claim is forfeited for failure to object. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [failure to interject a timely and specific objection or request an admonition or curative instruction forfeits a claim of prosecutorial misconduct on appeal].)  Defendant argues alternatively that defense counsel's failure to object constituted ineffective assistance of counsel.

" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)  To prevail on a claim of ineffective assistance of counsel, defendant must prove (1) that trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) that the deficiency resulted in prejudice to defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)  Defendant must show that there is " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

We conclude that defendant has failed to establish ineffective assistance of counsel.  Even assuming the remarks were improper and objectionable, defendant has not shown prejudice.  The jurors were instructed to follow the court's instructions on the law if the comments by the attorneys conflicted with those instructions, and here, the trial court gave the correct pattern instructions for voluntary manslaughter orally and in writing.  Further, in defense counsel's closing argument, he explained the state of mind necessary for heat of passion murder, as well as involuntary manslaughter.  Under these circumstances, it is not reasonably probable that, but for counsel's failure to object, the

13

result would have been more favorable to defendant. (See *People v. Cortez* (2016) 63 Cal.4th 101, 131-134 [finding no reasonable likelihood the jury construed or applied the prosecution's challenged remarks in an objectionable fashion under similar circumstances].)

III

*Foreseeability Language in Jury Instruction*

Defendant contends the trial court erred when it declined to instruct the jury that the death of another person must be foreseeable in order to be the natural and probable consequence of a defendant's act. As a result, defendant argues, the instructions allowed the jury to find defendant guilty of second degree murder even if it believed Lori's death was not foreseeable, resulting in prejudicial error. We find no error.

Over defendant's objection, the trial court instructed the jury on second degree murder without specifically stating that Lori's death must have been "foreseeable" for it to have been the natural and probable consequence of defendant's acts. Instead, the jury was instructed on second degree murder with malice aforethought with the CALCRIM No. 520 pattern instruction, which stated that to find defendant guilty of second degree murder, the jury had to find the defendant committed an act that caused the death of another person, and that he acted either with express or implied malice. According to the instruction, defendant acted with implied malice if, "one, he intentionally committed the act. Two, the natural and probable consequences of the act were dangerous to human life. Three, at the time he acted he knew his act was dangerous to human life. And four, he deliberately acted with conscious disregard for human life." (CALCRIM No. 520, as given.)[3] The instruction then stated: "An act causes death if the death is the direct,

---

[3]     The jury also was instructed on an alternative theory of second degree murder using the CALCRIM No. 520 pattern instruction, under which the People had to prove

14

natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death, and the death would not have happened without the act. [¶] A substantial factor is more than a trivial or remote factor. It must actually contribute to the death. . . ." (CALCRIM No. 520, as given.)

The jury also was instructed on proximate causation with CALCRIM No. 620, which stated: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death and the death would not have happened without the act. [¶] A substantial factor is more than a trivial or remote factor. It must actually contribute to the death. However, it does not need to be the only factor that causes the death. [¶] . . . [¶] Lori [ ] may have suffered from an illness or physical condition that made her more likely to die from the injury than the average person. The fact that Lori [ ] may have been more physically vulnerable is not a defense to murder or manslaughter. [¶] If the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death. This is true even if Lori [ ] would have died in a short time or as a result of other causes or if another person of average health would not have died as a result of the defendant's actions." (CALCRIM No. 620, as given.)

"[P]roximate causation requires that the death was a reasonably foreseeable, natural and probable consequence of the defendant's act, rather than a remote consequence that is so insignificant or theoretical that it cannot properly be regarded as a

---

that defendant had a legal duty to act, and his failure to perform that legal duty caused Lori's death.

15

substantial factor in bringing about the death." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1009-1010.) "Foreseeability does not require a high probability that the harm will occur, but merely that the harm be ' " 'a possible consequence which might reasonably have been contemplated.' " ' [Citation.]" (*Id.* at p. 1011, quoting *People v. Medina* (2009) 46 Cal.4th 913, 920.) "A result cannot be the natural and probable cause of an act if the act was unforeseeable. [Citation.]" (*People v. Roberts* (1992) 2 Cal.4th 271, 321-322.)

Here, CALCRIM Nos. 520 and 620 adequately described the concept of foreseeability by defining the "natural and probable consequence" of an act that causes death as "one that a reasonable person would know is likely to happen if nothing unusual intervenes." They further instructed the jury that defendant's act is a substantial factor in causing death if it "is more than a trivial or remote factor." Thus, contrary to defendant's contention, these instructions did not permit the jury to convict defendant of murder even if the jury believed the death was not foreseeable. Rather, taken together, they explain that death from defendant's conduct must be a likely consequence of defendant's action, which was not a trivial or remote factor in causing death. This language reflects the very concept of foreseeability. Accordingly, that the instructions did not specifically use the word "foreseeable" is immaterial. (See *People v. Fiu* (2008) 165 Cal.App.4th 360, 372 ["foreseeability is an important component of causation . . . but . . . language in [a jury instruction] requiring an injury or death to be a direct, natural, and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable"], relying on *People v. Temple* (1993) 19 Cal.App.4th 1750, 1756.)

IV

*Instruction Limiting Use of Voluntary Intoxication Evidence*

Finally, defendant argues the trial court violated his constitutional rights by instructing the jury with CALCRIM No. 625, which states that the jury could consider evidence of his voluntary intoxication only to determine whether defendant acted with

16

express malice. He contends that the jury should have been permitted to consider defendant's voluntary intoxication in connection with the voluntary manslaughter charge, and specifically, as it related to his argument that he acted in the heat of passion. Defendant concedes that our Supreme Court addressed a similar question in *People v. Soto* (2018) 4 Cal.5th 968 (*Soto*), where it held that evidence of voluntary intoxication is not admissible on the question of whether a defendant believed it necessary to act in self-defense. (*Id.* at p. 970.) Still, defendant urges us to follow the rationale of Justice Liu's dissent in *Soto*, which concludes that a "straightforward reading" of Penal Code section 29.4, subdivision (b) "makes evidence of voluntary intoxication admissible on the issue of whether a defendant charged with murder 'harbored express malice aforethought' and sets forth no exceptions." (*Id.* at pp. 982, 984-985 (dis. opn. of Liu, J.).) We find the reasoning of the *Soto* majority persuasive and apply it here.

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) "Malice may be express or implied. [¶] . . . [It] is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] [It] is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.) Voluntary "[m]anslaughter, a lesser included offense of murder, is an unlawful killing without malice. . . . Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

Penal Code section 29.4, subdivision (b) addresses the admissibility of evidence of voluntary intoxication, stating that it "is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." The jury here was instructed with a version of CALCRIM No. 625, which reflected the language of Penal Code section 29.4 and said, in relevant part, that the jury

17

may only consider evidence of defendant's voluntary intoxication to decide "whether the defendant acted with express malice, unlawfully intending to kill the victim."**[4]**

In *Soto*, our Supreme Court considered whether Penal Code section 29.4 allows the jury to consider evidence of voluntary intoxication to determine whether a defendant believed it necessary to act in self-defense, and thus, whether CALCRIM No. 625 is a correct instruction. (*Soto, supra*, 4 Cal.5th at p. 970.) To do so, it reviewed both the language of Penal Code section 29.4 and its legislative history. It noted that evidence of voluntary intoxication can be used to negate a mental state, such as the intent to kill, which requires an " ' "intent to do some further act or achieve some additional consequence." ' " (*Soto*, at p. 977.) However, *Soto* explained that the evidence cannot be used to show a defendant's judgment was impaired such that he erroneously believed he needed to act in self-defense: " 'If you voluntarily choose to become intoxicated and then kill someone, you may not claim that you were so intoxicated you were unaware your victim posed no threat to you when you killed, although you may claim you were too intoxicated to intend to kill or premeditate or have the specific intent to commit some other felony.' " (*Id.* at pp. 978-979.) The Supreme Court concluded that "it is clear what the Legislature intended to achieve when it amended [Penal Code] former section 22: to prohibit voluntary intoxication from being an excuse for poor judgment when someone kills." (*Soto*, at p. 978.) It also reasoned that to rule otherwise would place a person who acted in self-defense with the specific intent to kill in a better legal position than someone who acted in self-defense but only intended to seriously injure. (*Ibid.*)

---

**4**    The instruction further informed the jury that "[v]oluntary intoxication is not a defense to second degree murder based on implied malice, voluntary manslaughter, involuntary manslaughter, corporal injury to a spouse, battery upon spouse or possession of a controlled substance."

We conclude that the same rationale applies to the question of whether evidence of voluntary intoxication is admissible to show a defendant acted in the heat of passion. Both imperfect self-defense and heat of passion function to negate malice, and both reflect a defendant's failure in judgment. As with imperfect self-defense, a defendant cannot become voluntarily intoxicated and then claim the intoxication caused the defendant to act in the heat of passion. (See *Soto, supra*, 4 Cal.5th at p. 978.) This is because a defendant's heat of passion killing "does not involve the ' "intent to do some further act or achieve some additional consequence." ' [Citation.] Rather, it involves *judgment*." (*Id*. at p. 977, original italics.) As a result, admitting evidence of defendant's voluntary intoxication to prove he killed rashly contradicts *Soto*'s express prohibition against using voluntary intoxication evidence to excuse poor judgment when someone kills. (See *id*. at p. 978.) Accordingly, the trial court properly instructed the jury with CALCRIM No. 625, which excluded voluntary intoxication evidence with respect to heat of passion.

## DISPOSITION

The judgment is affirmed.

      KRAUSE      , J.

We concur:

      MAURO      , Acting P. J.

      HOCH      , J.