[No. B071448. Second Dist., Div. Seven. Nov. 9, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD TEMPLE, Defendant and Appellant.

## COUNSEL

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Kristofer Jorstad and Emilio E. Varanini IV, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—Convicted by jury of first degree murder (Pen. Code,[1] § 187)[2] and second degree robbery (§ 211) with great bodily injury (§ 12022.7) appellant contends the trial court erred by giving an incorrect causation instruction (CALJIC No. 3.40 (1992 Rev.)) and by refusing to give a defense requested correct one.

We conclude the contention is mistaken and affirm the judgment.

### FACTUAL BACKGROUND

It was undisputed that Alejandro Jiminez was robbed and beaten on Sunday, December 23, 1990, at approximately 8:45 p.m. near the High Hat

---

[1] Statutory references, unless otherwise noted, are to the Penal Code.
[2] A robbery special-circumstance allegation (§ 190.2, subd. (a)(17)) was found not true.

Motel in South Los Angeles and three days later died. It was also undisputed the perpetrators included three young Black men and that Edward Temple (appellant) was one of those three men.

In dispute was who administered the final and perhaps lethal kick to the victim's head, appellant or one of the other men.[3]

We summarize the accounts of the three eyewitnesses.

*Rosa Hernandez* was walking with her fiancé, Alejandro Jimenez, to the High Hat Motel when she noticed a tall, heavy Black man (man No. 1) behind them. When she and her fiancé reached the motel driveway, man No. 1 put a headlock on her fiancé, repeatedly punched him in the temple, dragged him to a wall, and struck his head against the wall. Her fiancé lay unconscious on the ground. Ms. Hernandez jumped on man No. 1 but was pushed by someone and fell on her side injuring her arm. She got up and stood by the wall.

Two other men arrived and talked to man No. 1. One of the two men (man No. 2) was taller and heavier than the other. The other man (man No. 3) had his hair in many pigtails with aluminum on the ends.

Man No. 2 and man No. 3 kicked the victim (Mr. Jiminez) in the head and side while man No. 1 removed the victim's wallet from his pocket. Man No. 1 then walked away to the street. Man No. 2 and man No. 3 left the victim and went up the motel stairs. Ms. Hernandez tried to revive her fiancé and he said "What happened?," stood up momentarily, and then slumped to the ground. She propped him against the wall.

Man No. 2 and man No. 3 came down the motel stairs "about 20 seconds" after they had gone up, and man No. 2 "knee-kicked" the victim under the chin. The victim fell, striking his head on the cement driveway. There was blood on his face. Man No. 2 and man No. 3 left but man No. 2 returned, picked up the victim's keys from the ground, and again went upstairs. Later, man No. 2 came down and went into the street.

---

[3]Appellant's tape-recorded extrajudicial statements to Detective Watson were played to the jury. Appellant admitted he and "Little Blue" were across from the High Hat Motel when they saw "Slick Rick" trying to rob a Mexican man. They helped "Slick Rick" by punching the Mexican man but did not kick him. "Slick Rick" and a woman named Tippy took the victim's money, about $150. When he and "Little Blue" left, "Slick Rick" was still with the Mexican man.

Appellant said he was 6' 2" and 250 pounds; "Slick Rick" was 6' 2"-6' 3" and 230-240 pounds.

Appellant did not testify.

An ambulance arrived and took the victim to a hospital where, three days later, he died.

Three months after the incident, on March 29, 1991, Ms. Hernandez was shown photographs of six men. She identified one of them, appellant, and testified he was man No. 1.

*Barbara Toray* lived in apartment 12 on the second floor of the High Hat Motel and knew both appellant, known as "Papa," and his friend "Little Blue" who was short and slender. Earlier that Sunday evening she had done "Little Blue's" hair, styling it into nine "piggy tails."[4]

About 8:45 p.m. she heard noise from the parking area, went outside onto the balcony, and saw people beating up a Mexican guy who lay on the ground. Appellant, bent over from the waist, repeatedly punched the Mexican man while "Little Blue" repeatedly kicked him. Both appellant and "Little Blue" searched the victim's pockets. A short time later, after the victim had been moved, appellant came down the motel stairs and kicked the victim in the head.

*Angela Sullivan*, 14 years old at trial, 12 years old when the incident occurred, lived with her mother in apartment 2, on the first floor of the High Hat Motel. She knew appellant, "Little Blue," and their friend "Little Y." That Sunday night she was home alone, in bed, when she heard noises and screams. She went to the window and about sixteen feet away saw a man on the ground being beaten by "three boys." Appellant hit the man with his fists and kicked him. "Little Blue" and "Little Y" kicked the man. They were digging in the man's pockets, talking to each other, and laughing.

Angela left the window, lowered the television sound, returned to the window, saw the man still on the ground but appellant no longer present. Then she saw appellant and "Little Blue" come down the motel stairs and saw appellant walk by her window. A moment later she heard a bumping noise against her apartment wall.

Dr. Joseph L. Cogan, a deputy medical examiner with the Los Angeles County Coroner's office,[5] testified that the victim died from multiple blunt force *injuries* to the head. One of the victim's injuries, a linear skull fracture to the back of the head, by itself, would have caused death. The other injuries, collectively, might have been serious enough to cause death.

---

[4]A description which coincided with Rosa Hernandez's description of man No. 3.

[5]Another deputy medical examiner, Dr. James Ribe, performed the autopsy and ascribed the cause of death to brain stem herniation due to blunt force injury. Dr. Ribe did not testify.

## DISCUSSION

### 1. *Proximate Cause*

■ Appellant contends the trial court erred by giving an erroneous causation instruction (CALJIC No. 3.40 (1992 rev.)) and by refusing to give two defense-requested instructions.

We begin our consideration of this contention by turning our legal clock back to December 8, 1991, the day before our Supreme Court decided *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872].

Pre-*Mitchell* v. *Gonzales*, the standard causation instruction used in criminal trials (CALJIC No. 3.40[6] (5th ed. 1988)) was essentially identical to the standard causation instruction used in civil trials (BAJI No. 3.75[7] (7th ed. 1986)). Both stated: "A proximate cause of [ ] is a cause which, in natural and continuous sequence, produces the [ ] and without which the [ ] would not have occurred."

Chief Justice Lucas began his majority opinion in *Mitchell* v. *Gonzales* by stating: "In this case we decide whether BAJI No. 3.75 . . . should continue to be given in this state, or whether it should be disapproved in favor of BAJI No. 3.76 . . . ." (*Mitchell* v. *Gonzales, supra*, 54 Cal.3d 1041, 1044.) He concluded BAJI No. 3.75 should be disapproved (54 Cal.3d at p. 1056) in favor of BAJI No. 3.76. (54 Cal.3d at pp. 1052-1054.)

Justice Kennard, in a vigorous dissent, argued that by disapproving BAJI No. 3.75 (essentially identical to CALJIC Nos. 3.40 and 8.55) the majority had created an instruction vacuum. BAJI No. 3.75 incorporated both cause in fact ("without which the would not have occurred") *and* proximate cause ("is a cause which *in natural and continuous sequence . . .*"). But BAJI No.

---

[6]The instruction reads:

"[To constitute the crime of _____ there must be in addition to the _____ [result of the crime] an unlawful act which was a proximate cause of that _____ [result of the crime].]

"A proximate cause of the _____ [result of the crime] is a cause which, in natural and continuous sequence, produces the _____ [result of the crime] and without which the _____ [result of the crime] would not have occurred."

CALJIC included the same instruction, but tailored for homicide cases, as CALJIC No. 8.55.

[7]The instruction reads: "A proximate cause of [injury] [damage] [loss] [or] [harm] is a cause which, in natural and continuous sequence, produced the [injury] [damage] [loss] [or] [harm] and without which the [injury] [damage] [loss] [or] [harm] would not have occurred."

3.76,[8] Justice Kennard asserted, contained only a cause in fact test. (*Mitchell v. Gonzales, supra,* 54 Cal.3d at pp. 1056-1062, (dis. opn. of Kennard, J.).)

The issue of proximate cause instructions, this time in a criminal case, resurfaced a scant three and one-half months later in *People* v. *Roberts* (1992) 2 Cal.4th 271 [6 Cal.Rptr.2d 276, 826 P.2d 274].

Roberts had stabbed a fellow inmate, Charles Gardner, 11 times while a confederate held Gardner. When Roberts and his confederate fled, Gardner grabbed a knife from the floor, ran or staggered after his assailants, and stabbed, not one of his assailants, but a prison guard. Both Gardner and the prison guard died. Roberts was convicted of murdering both of them.

As to the murder of Gardner, Roberts contended that inadequate medical care, not the stabbing, was the proximate cause of death. He argued the jury should have been, but was not, instructed to decide whether substandard medical treatment of Gardner was foreseeable.

In rejecting the contention Justice Mosk acknowledged ". . . the instruction defining proximate cause [CALJIC No. 8.55] contained language virtually identical to that of BAJI No. 3.75 (7th ed. 1986), which we disapproved in *Mitchell* v. *Gonzales* . . . ." (*People* v. *Roberts, supra,* 2 Cal.4th at p. 313.) He also stated, "The civil instruction's infirmity is equally great in criminal cases." (*Ibid.*) Nevertheless, Justice Mosk concluded, there was no prejudice because the defects of CALJIC No. 8.55 benefited defendant and there was no evidence of "a possibly supervening cause of Gardner's death." (2 Cal.4th at p. 313.)

Notably, Justice Mosk did *not,* unlike *Mitchell* v. *Gonzales,* approve the alternative causation instruction, BAJI No. 3.76. (See fn. 8.)

As to the murder of the prison guard, Roberts contended the evidence was insufficient and the jury was incorrectly instructed on proximate cause.

Writing for a unanimous court, including Justice Kennard who had dissented in *Mitchell* v. *Gonzales,* Justice Mosk did not analyze the sufficiency of the evidence by the "substantial factor" test of BAJI No. 3.76. Instead, he determined evidence of proximate cause was sufficient because the guard's death "was the *natural* and *probable* consequence of defendant's act." (*People* v. *Roberts, supra,* 2 Cal.4th at p. 321, italics added.) Justice Mosk's

---

[8]The instruction reads: "The law defines cause in its own particular way. A cause of [injury] [damage] [loss] [or] [harm] is something that is a substantial factor in bringing about an [injury] [damage] [loss] [or] [harm]." (BAJI No. 3.76 (1992 Rev.).)

lengthy proximate cause analysis (*id.* at pp. 315-322) added a third word, "direct," to the proximate cause test: "The criminal law thus is clear that for liability to be found, the cause of the harm not only must be *direct*, but also not so remote as to fail to constitute the *natural* and *probable* consequence of the defendant's act." (*Id.* at p. 319, italics added.) The opinion "acknowledge[d] there is no bright line demarcating a legally sufficient proximate cause from one that is too remote." (*Id.* at p. 320, fn. 11.)

Concerning foreseeability and proximate cause, we note the following. First, the opinion holds that an instruction "to *disregard* foreseeability" is error. (2 Cal.4th at p. 322, italics added.) Second, that ". . . principles of proximate cause may sometimes assign homicide liability when, *foreseeable or not*, the consequences of a dangerous act . . . [are] deemed worthy of punishment." (*Id.* at p. 317, italics added.) Third, that the word "foreseeable" is *not* part of the tripartite test of proximate cause.

We conclude that CALJIC No. 3.40, disapproved in *Mitchell* v. *Gonzales* (because essentially identical to BAJI No. 3.75), as revised by the CALJIC committee in 1992, correctly embodies the *Mitchell* v. *Gonzales-People* v. *Roberts* test of proximate cause.

It reads: "[To constitute the crime of _____ there must be in addition to the _____ [result of the crime] an unlawful act which was a proximate cause of that _____ [result of the crime].]

"The law has its own particular way of defining cause. A cause of the _____ [result of the crime] is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the _____ [result of the crime] and without which the _____ [result of the crime] would not occur." (CALJIC No. 3.40 (1992 rev.).)

The trial court, with appropriate insertions, properly gave this instruction and properly refused to give appellant's requested instructions.[9]

---

[9]One of appellant's requested instructions reads:

"To constitute murder (or manslaughter) there must be an unlawful act which was a proximate cause of the death of a human being.

"A proximate cause is a cause which could reasonably have been foreseen. An intervening cause which could reasonably have been foreseen or which is a normal incident of the risk created is a proximate cause. An unforeseeable or abnormal intervening cause which produces a result which could not have been foreseen is not a proximate cause."

The other reads:

"If you find that the defendant acted in an illegal manner and that the illegal act was a proximate cause of death, the defendant is not relieved from responsibility for a death

## 2. *Custody credits*

The parties agree that although the abstract of judgment correctly awards appellant *total* custody credits of 885 days, the correct good time credit is 294, not 295, days. (*People* v. *Bravo* (1990) 219 Cal.App.3d 729, 731-732 [268 Cal.Rptr. 486].) We modify the abstract of judgment accordingly.

### DISPOSITION

The abstract of judgment is modified by deleting *295* as the number of "good time" days credit and inserting *294*.

As modified, the judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 10, 1994.

---

resulting from that act even though there is an intervening cause of death if that intervening cause of death was foreseeable. An intervening cause of death is foreseeable if:

"(1) at the time of his act, the defendant realized or reasonably should have realized that a third person might act as the person who committed the act which constituted the intervening cause did, [*sic*] or,

"(2) a reasonable person knowing the situation at the time of the defendant's action would not have regarded it as highly extraordinary that the person who committed the act which constituted the intervening cause acted as he did, or,

"(3) the conduct of the third person whose act constituted the intervening cause was not extraordinarily negligent and was a normal consequence of the situation created by the defendant.

"If, however, the intervening act was not foreseeable, it is a superseding cause of death and relieves the defendant from liability even though his act may have been a proximate cause of death."