Filed 9/13/24

CERTIFIED FOR PARTIAL PUBLICATION*


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D081131 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN409541) |
| WAYNE ELIJAH JONES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael D. Washington, Judge. Affirmed.

Savannah Montanez and Pauline E. Villanueva, under appointments by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, James M. Toohey and Susan E. Miller, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.C, III.D, & III.E.

# I. INTRODUCTION

In this appeal from his first degree murder conviction for the beating death of Michael Robinson, Wayne Jones claims Robinson's family's decision to withdraw life support from Robinson broke the chain of legal causation and relieved Jones of criminal liability. He further contends the prosecutor committed misconduct during closing argument, there was insufficient evidence of premeditation and deliberation, and the trial court applied the wrong standard in denying his motion to reduce the verdict. Finding no error, we affirm the conviction.

# II. BACKGROUND

During the evening of January 11, 2020, both Jones and Robinson were in a shopping center, on opposite sides of a 99 Cent Store entrance area. Robinson sat on the sidewalk west of the store's entry, while Jones stood in front of an ATM on the east side. Jones retrieved his bicycle, to which he had an approximately three-foot long dowel-like stick attached, and walked into the parking lot, westward. Meanwhile, Robinson made his way eastward on the sidewalk. A row of cars separated them as they walked past each other.

Immediately after passing Robinson, Jones discarded his bike behind a parked car, armed himself with the stick, and began walking in the same direction as Robinson. Robinson stopped and stood in front of the ATM, facing the 99 Cent Store. Jones continued walking directly toward Robinson, his approach concealed by a parked car.

Holding the stick with two hands, Jones struck Robinson in the back of the head with a horizontal swing. Robinson went limp, falling to the ground. Jones moved closer and stood over Robinson who was motionless on the pavement, face down, and nonresponsive. Jones hit Robinson in the back of the head with the stick three more times in rapid succession. Each time,

2

Jones held the stick with both hands, raised it over his head, and bludgeoned Robinson. Jones then walked back to his bicycle, packed up the stick, and slowly rode away.[1]

A bystander called 911. Robinson began unsuccessfully to push himself up. When EMTs arrived, they put Robinson in a medically induced coma and transported him to the hospital. Treating surgeon Dr. James Schwendig determined that Robinson's skull was fractured into multiple pieces and pushed inward, causing Robinson's brain to bruise and swell. These injuries were life-threatening, and if not treated would almost certainly kill Robinson. Robinson therefore underwent surgery to reconstruct his skull and relieve brain swelling.

After surgery, Robinson was admitted into the intensive care unit where medical personnel connected him to a ventilator. During the next day, January 12, Robinson remained in a medically induced coma. On January 13, hospital personnel stopped sedating Robinson but he remained nonresponsive.

On January 14, Robinson made a purposeful movement with his right hand, trying to reach for his breathing tube, but the left side of his body remained immobile. Later that day, Dr. Schwendig spoke with Robinson's ex-wife, brother, and 18-year-old son. Dr. Schwendig outlined for the family the spectrum of possible outcomes that Robinson could expect. The continuum started at profoundly disabled, where Robinson would require a feeding tube and would not be able to meaningfully interact with other people. At the other end of the spectrum, Robinson might recover sufficiently to where he could enjoy watching TV and interacting with others but would

___

[1]    Surveillance cameras at the ATM and 99 Cent Store captured footage of the event which attorneys showed the jury during trial.

3

still need assistance with tasks of daily living and might never be able to eat on his own.  According to Dr. Schwendig, almost all patients with injuries this severe end up somewhere between the described possible outcomes.  And it could take two years or longer to know what recovery Robinson would achieve.

Dr. Schwendig further explained to the family that while Robinson had a "decent" chance of surviving, even in the best-case Robinson would need to live in a subacute nursing facility.[2]  And, Robinson would almost certainly have significant disability with a likelihood that he would be partially, if not completely, paralyzed on his left side.  The doctor summarized it to the jury this way:  "What I mean . . . is that we thought [Robinson] had a good chance of not dying from this and being able to leave the acute care hospital, but not live independently.  Not get an apartment [in] town and run his own life."

The following day, January 15, Robinson appeared more awake, with his Glasgow Coma Score (GSC) reaching 7.  The GCS is a very crude brain function measurement ranging from 3, which is a coma, to 15, which is normal activity.  Prior to January 15, Robinson's GCS score had remained at a 3.[3]  However, based on Robinson's predicted recovery and his limited

---

[2]    A subacute nursing facility provides long-term care below the level of an acute care hospital, like where Robinson was being treated.  As described by Dr. Schwendig, a subacute care facility would have nurses and other aids who attend to the patients' needs, but it is not independent living.

[3]    Dr. Schwendig explained to the jury that "from looking at thousands of patients [with] a GCS of 3, there is almost no chance . . . of recovery to the point where you could live independently and do what most of us would want to do to enjoy life."

resources,[4] the family agreed Robinson would not want to be kept alive. Later that night, Robinson's ex-wife called the hospital, stating that the family wanted to withdraw Robinson's life support but wished to delay that process until January 16, when Robinson's brother and the brother's young son could arrive at the hospital.

On January 16, Robinson's condition remained unchanged from the previous day. His GCS score remained at 7. With his family at his bedside, medical staff withdrew Robinson's life support. Robinson died later that evening. The medical examiner's office determined the cause of death was blunt force injuries to the head. On January 24, the Office of the San Diego County District Attorney filed a murder charge against Jones.

After his trial in July 2022, the jury found Jones guilty of first degree premeditated murder (Pen. Code,[5] §§ 187, subd. (a), 189, subd. (a)) and that he personally used a dangerous or deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)). The trial court sentenced Jones to prison for 25 years to life for the murder, plus one year for the weapon enhancement. Jones's timely appeal followed.

## III. DISCUSSION

Jones claims his murder conviction should be reversed because: (A) there was insufficient evidence that he proximately caused Robinson's death; (B) the trial court did not properly instruct the jury on proximate cause; (C) the prosecutor committed prejudicial misconduct during closing argument; (D) there was insufficient evidence of premeditation and deliberation; and (E) the trial court applied the wrong standard in denying

---

[4]   Robinson lived on the streets for the previous five years.

[5]   All undesignated section references are to the Penal Code.

5

Jones's motion to reduce the verdict. We disagree with each of these claims and affirm the judgment.

## A. Sufficiency of the Evidence Regarding Proximate Cause

Jones argues doctors expected Robinson to live after the attack, and Robinson died because his family prematurely authorized withdrawal of life support. Jones therefore claims the family's decision to remove necessary care created an independent intervening cause of death, negating his liability for Robinson's murder. We find sufficient evidence that the withdrawal of life support was a dependent, not independent, intervening cause of death leaving unbroken the chain of causation directly linking Jones's attack to Robinson's death.

### 1. Standard of Review

When a defendant challenges the sufficiency of the evidence supporting a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) "Whether the defendant's conduct was a proximate, rather than remote, cause of death is ordinarily a factual question for the jury unless ' "undisputed evidence . . . reveal[s] a cause so remote that . . . no rational trier of fact could find the needed nexus." ' [Citation.] A jury's finding of proximate causation will be not disturbed on appeal if there is 'evidence from which it may be reasonably inferred that [the defendant's] act was a substantial factor in producing' the death." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1010.)

6

2. *Proximate Cause in General*

Our Supreme Court has explained proximate cause principles, observing:

> "This basic principle of proximate causation was articulated over a century ago in our decision in *People v. Lewis* (1899) 124 Cal. 551 [57 P. 470]. There the defendant had shot the victim in the intestines, sending him toward a painful and inevitable death he apparently decided to hasten by slitting his own throat. We held Lewis was properly convicted of manslaughter because the victim's response, though suicidal, was natural and understandable; hence it was not an independent intervening cause of death. Even 'if the deceased did die from the effect of the knife wound alone, no doubt the defendant would be responsible, if it was made to appear, and the jury could have found from the evidence, that the knife wound was caused by the wound inflicted by the defendant in the natural course of events.' (*Id.* at p. 555.) By contrast, we posed, 'Suppose one assaults and wounds another intending to take life, but the wound, though painful, is not even dangerous, and the wounded man knows that it is not mortal, and yet takes his own life to escape pain, would it not be suicide only?' (*Id.* at p. 556.) The answer would be yes, and there would be no homicide liability, if '[t]he wound induced the suicide, but the wound was not, in the usual course of things, the cause of the suicide' (*ibid.*)—in other words, if death would not have inevitably followed and instead occurred through the independent intervening cause of the victim's own will to die." (*People v. Cervantes* (2001) 26 Cal.4th 860, 869 (*Cervantes*).)

Stated differently, "the principle that consequences which follow from the original wrong in unbroken sequence, without an intervening sufficient independent cause, are natural and proximate and for these the original wrongdoer is responsible." (*Merrill v. Los Angeles Gas & Elec. Co.* (1910) 158 Cal. 499, 503.) Indeed, proximate cause is an element of murder. (*People v. Carney* (2023) 14 Cal.5th 1130, 1137–1138 (*Carney*).) " 'In general,

7

"[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating." ' " (*Id.* at p. 1138.)

However, if an intervening force is present, it is necessary to determine whether that cause "is sufficient to absolve the defendant of liability 'because the "defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause." ' " (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1325 (*Brady*).) What separates cases where a defendant is absolved of liability for his original act is whether the intervening cause is independent[6] or dependent. (*Cervantes, supra,* 26 Cal.4th at p. 871.)

In general, an independent intervening cause negates a defendant's criminal lability. (*Cervantes, supra,* 26 Cal.4th at p. 871.) Such causes are described as conduct that "was so unusual, abnormal, or extraordinary that it could not have been foreseen" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 52), and " ' "an independent event [that produces] harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible." ' " (*Brady, supra,* 129 Cal.App.4th at p. 1325.) A third party's act will not constitute an independent intervening cause unless it is " '*both* unforeseeable *and* causes harm that was not the foreseeable consequence of the initial actor's conduct.' " (*Carney, supra,* 14 Cal.5th at p. 1139, italics added.)

On the other hand, criminal liability remains where conduct is deemed a dependent intervening cause, which is " ' "a normal and reasonably foreseeable result of defendant's original act." ' " (*Cervantes, supra,*

---

6    Independent intervening causes are also referred to as superseding. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 369, fn. 8 (*Fiu*).)

8

26 Cal.4th at p. 871.)  For an intervening cause to be dependent, it " ' " 'need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough.' " ' " (*Ibid.*)  Additionally, " ' " "The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' " ' " (*Ibid.*)

The above ideas yield two inquiries which determine if criminal liability exists in a given context.  (See, e.g., *People v. Dawson* (2009) 172 Cal.App.4th 1073, 1094; *Fiu, supra,* 165 Cal.App.4th at p. 371.)  First, we must determine whether the intervening cause was reasonably foreseeable.  Or, second, if the intervening cause was unforeseeable, did it cause a type of harm that could reasonably be expected from the defendant's initial conduct.  If we can answer either of these questions in the affirmative, then the defendant remains criminally liable.  (*Ibid.*)

3.      *Proximate Cause and Removal of Life Support*

Two published opinions in California address proximate cause in the context of a family withdrawing life support:  *People v. Saldana* (1975) 47 Cal.App.3d 954 (*Saldana*), and *People v. Funes* (1994) 23 Cal.App.4th 1506 (*Funes*).  In *Saldana*, the defendant shot the victim in the neck, and due to the victim's lack of brain activity when he arrived at the hospital, a physician declared the victim dead.  (*Saldana*, at p. 957.)  Without medical intervention, the victim's other organs would soon stop functioning, but the hospital could have sustained his heartbeat for several weeks to a month.  (*Ibid.*)  Because the victim's brain no longer functioned, the court concluded removal of his life support was not an independent intervening cause of death which would absolve Saldana of liability.  (*Id.* at pp. 958–959.)

9

In *Funes*, a hospital admitted a victim who suffered a severe blunt force head injury. (*Funes, supra,* 23 Cal.App.4th at p. 1515.) The victim developed pneumonia while hospitalized. (*Id.* at p. 1522.) The victim's family decided to withhold antibiotic treatment. (*Ibid.*) While in the hospital the victim remained in a persistent vegetative state. (*Ibid.*) Forty-six days after his admission to the hospital the victim died from " 'acute bronchial pneumonia . . . caused by head injuries.' " (*Ibid.*) At trial, a doctor said that with life support efforts, the victim could live as long as five more years, but would eventually succumb to pneumonia. (*Ibid.*) The court of appeal noted that "the decision to withhold antibiotics clearly was *not* the sole cause of death," and "the *only* reasonable inference [was] that the removal of life support or treatment [was] *not* independent of the defendant's criminal act." (*Id.* at p. 1524 & fn. 9.) It determined "the decision to withhold antibiotics was, as a matter of law, not an independent intervening cause. Instead, it was a normal and reasonably foreseeable result of defendant's original act." (*Id.* at pp. 1523–1524.)

Both *Saldana* and *Funes* underscore that while removal of life support may play a role in causing death, it may also be dependent on the defendant's act of causing the injuries requiring medical intervention. This is consistent with conclusions reached by sister states facing similar situations. Some go as far as finding the removal of life support cannot as a matter of law be an independent intervening cause of death. (See, e.g., *State v. Pelham* (2003) 176 N.J. 448, 465 ["We agree with the widely recognized principle that removal of life support, as a matter of law, may not constitute an independent intervening cause for purposes of lessening a criminal defendant's liability."]; *State v. Yates* (Wash.Ct.App. 1992) 64 Wash.App. 345, 351 ["When life support is removed, the cause of death is not the

10

removal, but whatever agency generated the need for the life support in the first instance."]; *State v. Patterson* (S.C.Ct.App. 2006) 367 S.C. 219, 235 [Where victim died from severe traumatic blows to the head, "the removal of life support cannot be considered an independent intervening cause capable of breaking the chain of causation triggered by the defendant's wrongful actions"].)[7]

We also find guidance in cases assessing intervening causes in situations other than those involving removal of medical interventions. For instance, in *Fiu*, the defendant and several young gang members "beat the victim severely, rendering him unconscious and leaving him lying outside, around the corner from defendant's residence." (*Fiu, supra,* 165 Cal.App.4th at p. 373.) Arriving 10 to 15 minutes later, Johnson kicked the victim, put a milk crate on the victim's neck and jumped on it, and stabbed the victim in the neck twice. (*Ibid.*) The victim died from blunt force trauma to the head, with the medical examiner determining the knife wounds did not cause the victim's death. (*Ibid.*) The court of appeal found Johnson's actions were not an independent intervening cause, finding, "Whether or not Johnson's arrival and actions were themselves foreseeable, the death of the victim due to beating was." (*Ibid.*) It further stated, "Blows to the head, similar to those inflicted by defendant and the young gang members initially, caused the victim's death. This type of harm was clearly foreseeable; no reasonable jury could have found that it was not." (*Id.* at p. 374.)

Our Supreme Court identified other such examples when discussing provocative act murder cases. In those situations a " 'victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be

---

[7] We do not reach the question of whether withdrawing life support is always a dependent cause of death.

considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice.' " (*Cervantes, supra,* 26 Cal.4th at p. 868.)

4.     *Discussion*

In this case we answer the intervening causation questions discussed above in the affirmative.  Consequently, we find ceasing heroic measures to keep Robinson alive was a dependent intervening act brought on by Jones's actions, rendering Jones criminally liable.

First, we consider whether the intervening cause of removing life support here was foreseeable.  Using great force, Jones hit Robinson in the head using a blunt object, shattering Robinson's skull while also badly damaging brain tissue.  EMTs sedated Robinson when they arrived on scene. They took Robinson to the hospital where medical professionals assessed Robinson's situation and apprised his family.  The family told the hospital that Robinson would not want to live with such disabilities.  The hospital removed Robinson's life support.

Although the precise sequence of events may not have been foreseeable, such a high level of predictability is not required.  (*Cervantes, supra,* 26 Cal.4th at p. 871.)  " ' " '[A] possible consequence which might reasonably have been contemplated is enough.' " ' " (*Ibid.*)  Based on Jones's actions, it is reasonable to contemplate a scenario where medical treatment might prevent death but is nonetheless undesirable because the victim could not be restored to a quality of life she or he would tolerate as acceptable.  Accordingly, the jury could reasonably infer that the decision to withdraw Robinson's life support and allow him to succumb to the injuries Jones inflicted was not "so unusual, abnormal, or extraordinary that it could not have been foreseen."

12

(*People v. Schmies, supra,* 44 Cal.App.4th at p. 52.) This is so because withdrawal of Robinson's life support was a " 'reasonable response to the dilemma thrust upon' " Robinson's family by Jones's intentional acts. (*Cervantes, supra,* 26 Cal.4th at p. 868.) Further, there was no evidence that the withdrawal of life support was " 'grossly improper' medical treatment" or " ' the *sole* cause of death and hence an unforeseeable intervening cause.' " (*Funes, supra,* 23 Cal.App.4th at p. 1524, fn. 9.)

We turn now to the second inquiry, where we examine if removing life support for Robinson caused a type of harm that could reasonably be expected from the Jones's conduct. As explained, the injuries Jones inflicted were almost certain to kill Robinson in the absence of medical treatment, and they eventually caused Robinson's death. Like *Fiu,* "[t]his type of harm was clearly foreseeable," and "[w]hether or not [the decisions of Robinson's family] were themselves foreseeable, the death of the victim due to beating was." (*Fiu, supra,* 165 Cal.App.4th at pp. 373–374.)

Jones argues that the situation we describe is closer to the hypothetical from *Lewis* (described in *Cervantes*) where a person not mortally injured, but in severe pain, nevertheless decides to commit suicide. Jones contends Robinson's family stood in Robinson's shoes and effectively exercised his own will to die. We disagree.[8] First, Robinson's death cannot be characterized as a suicide. When a surrogate decisionmaker withdraws healthcare in the circumstances seen here the resulting death "does not for any purpose constitute a suicide." (Prob. Code, § 4656.)

---

8　We acknowledge this hypothetical is dicta, but "our high court's ' "dicta generally should be followed, particularly where the comments reflect the court's considered reasoning." ' " (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 589.)

13

Second, the *Lewis* suicide hypothetical is distinguishable because it involved a non-life threatening injury which resulted in an unforeseeable reaction by the victim that caused death. Suicide is not a foreseeable response to a non-dangerous albeit painful wound. In contrast, Jones inflicted life-threatening wounds, Robinson's life support was not removed to escape pain but rather based on his chances of recovering a life he would want. Robinson's resulting death was a foreseeable outcome of the injuries Jones inflicted.

In sum, based on the nature of Jones's attack, it was reasonably foreseeable that Robinson would die. The removal of life support was not so unusual and did not produce harm so far beyond the risk created by Jones's actions that it would be unfair to hold Jones responsible for murder. Accordingly, sufficient evidence supports that the removal of life support was a dependent intervening cause, and that Jones proximately caused Robinson's death.

## B.    *Instructional Error*

Jones contends the jury was not informed how to identify an independent intervening cause of death. He claims the trial court should have given the pinpoint instruction he proposed, or the trial court should have provided some other additional instruction on intervening causation. We disagree.

### 1.    *Additional Background*

The People asked the trial court to instruct the jury on causation using applicable portions of CALCRIM No. 520:[9]

---

[9]    CALCRIM No. 520 is titled, "First or Second Degree Murder With Malice Aforethought."

14

"An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (Italics omitted.)

Counsel for Jones objected, requesting the following pinpoint instruction instead:

"A person who has injured another is not responsible for the other's death, even though the death would not have occurred but for the injury, if the death is the result of some other independent intervening cause.

"For example, suppose one assaults and wounds another, intending to take life, but the wound, though painful, is not mortal. If the wounded man takes his own life to escape the pain, it would be suicide only, not homicide. There would be no homicide liability, if the wound induced the suicide, but the wound was not, in the usual course of things, the cause of the suicide. In other words, if death would not have inevitably followed and instead occurred through the independent intervening cause of the victim's own will to die.

"In this case you must decide from the evidence whether the acts of others constituted an independent intervening cause, so that those acts, rather than any act by the defendant, were the proximate cause of death.

"If you have a reasonable doubt as to whether the defendant's act was the proximate cause of death, you must find him not guilty."

The trial court declined to give the requested pinpoint instruction and used CALCRIM No. 520. Additionally, consistent with the People's request and CALCRIM No. 520's bench notes, the trial court also instructed the jury with CALCRIM No. 620:

"There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.

"If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty." (Italics omitted.)[10]

Defense counsel then asked for an additional sentence explaining that if the death occurred by an independent intervening cause, the jury must find Jones not guilty. The trial court denied that request.

2. *Discussion*

Where causation is at issue, as in the case here, the trial court must instruct the jury on proximate cause. (*People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1246.) Additionally, " 'Parties are entitled to legally correct and factually warranted pinpoint instructions, should they request such additional instruction.' " (*People v. Zemek* (2023) 93 Cal.App.5th

---

10  CALCRIM No. 620 explains issues surrounding causation and includes three optional bracketed paragraphs: "A. Negligence of Decedent or Third Party, Not Medical Personnel," "B. Negligence of Medical Personnel," and "C. Vulnerable Victim—Injury Accelerating Death." The trial court determined these bracketed paragraphs did not apply and therefore did not include them in the instructions given to the jury.

16

313, 346 (*Zemek*).)  But a pinpoint instruction may be refused " 'if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' " (*Ibid*.)  We independently review claims of instructional error.  (*Ibid*.)

In *Zemek*, we recently addressed the denial of a pinpoint instruction under circumstances similar to those here.  The defendant was the victim's caretaker, and despite knowing the victim suffered from confusion and previously overdosed on her medication multiple times, the defendant left the victim alone for several days.  (*Zemek, supra,* 93 Cal.App.5th at pp. 320–321.)  While the caretaker was gone the victim overdosed and died.  (*Id*. at p. 321.)  The pathologist could not determine whether the overdoes was an accident, a suicide, or a homicide.  (*Ibid*.)  Standing trial for murder, the defendant requested a pinpoint instruction defining an independent intervening cause, instructing the jury to decide if an accidental overdose or suicide occurred, and if so, whether that was an intervening cause.  (*Id*. at p. 344.)  The trial court declined defendant's request.  (*Ibid*.)

We upheld the trial court's denial of the requested instruction on several grounds.  (*Zemek, supra,* 93 Cal.App.5th at pp. 346–347.)  We found that the requested pinpoint instruction was largely a restatement of the probable cause instructions given to the jury under CALCRIM Nos. 520 and 620, as well as two other instructions with substantially similar causation

provisions.[11]  We held "[t]he given instructions properly described to the jury that the defendant's failure to act caused the victim's death if the death was the direct, natural, and probable consequence (defined as something a reasonable person would know is likely to happen if nothing unusual intervenes) of the failure to act.  As such, while the given instructions did not explicitly include or define the phrase 'independent intervening cause,' the instructions nevertheless conveyed that if something 'unusual' intervened, a death might not be the direct, natural, and probable consequence of the defendant's failure to act." (*Zemek,* at p. 346.)

Our holding in *Zemek* finds support in the California Supreme Court's recent *Carney* decision which involved a shootout between gang members that resulted in a bystander's death.  (*Carney, supra,* 14 Cal.5th at pp. 1135–1136.)  Addressing substantially similar jury instructions that make no reference to "superseding" or "intervening" causes, our Supreme Court concluded:

> "[I]f an intervening cause is a reasonably foreseeable result of a defendant's initial act, ' " " 'the intervening act is "dependent" and not a superseding cause, and will not relieve [the] defendant of liability.' " ' (*Cervantes, supra,* 26 Cal.4th at p. 871.)  Conversely, '[a] result cannot be the natural and probable cause of an act if the act was unforeseeable.' ([*People v.*] *Roberts* [(1992)] 2 Cal.4th [271,] 321–322.)  Based on this foreseeability inquiry, therefore, a jury necessarily considers, in its determination of

---

11     Those other two instructions were CALCRIM No. 580 (lesser included offense of voluntary manslaughter) and a special instruction regarding an elder abuse enhancement.  (*Zemek, supra,* 93 Cal.App.5th at p. 345, fn. 18.)  The trial court in *Zemek* also instructed the jury with CALCRIM No. 620's three optional bracketed paragraphs not used in this case.  (*Zemek,* at pp. 345–346; see fn. 10, *ante.*)  However, since we did not rely on those bracketed paragraphs in our analysis in *Zemek* (*Zemek,* at pp. 346–347),we find that distinction inconsequential despite Jones's claim to the contrary.

proximate cause, whether there was any intervening cause that was unforeseeable and constituted a superseding cause." (*Carney, supra,* 14 Cal.5th at p. 1143.)

Other appellate courts exploring this issue agree that the concept of intervening causation can be adequately conveyed to the jury without expressly using that terminology. (See, e.g., *Fiu, supra,* 165 Cal.App.4th at p. 375 ["had there been any supervening act, the victim's death would not have been produced 'as a direct, natural and probable consequence' of a chain of events set in motion by defendant's actions. CALJIC No. 3.40[12] adequately conveys this concept."]; *People v. Temple* (1993) 19 Cal.App.4th 1750, 1756 & fn. 9 [CALJIC No. 3.40 correctly embodied test for proximate cause and trial court properly rejected more specific instructions on intervening causes requested by defendant]; *People v. Hebert* (1964) 228 Cal.App.2d 514, 520–521 ["the jury should have been instructed in clear and simple language" regarding proximate cause, and the term " 'supervening cause' " was "vague and confusing" and did not address key concept of foreseeability]; *People v. Hansen* (1997) 59 Cal.App.4th 473, 482

---

12      CALJIC No. 3.40 and CALCRIM No. 520 are very similar. CALJIC No. 3.40 states in relevant part: "A cause of the (result of the crime) is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the (result of the crime) and without which the (result of the crime) would not occur." Similarly, CALCRIM No. 520 states in pertinent part: "(An act/ [or] (A/a) failure to act) causes death if the death is the direct, natural, and probable consequence of the (act/ [or] failure to act) and the death would not have happened without the (act/ [or] failure to act)."

[despite no specific instruction on superseding cause, CALJIC Nos. 3.40 and 3.41[13] "properly framed the superseding cause issue into layman's terms"].)

These cases persuade us that although Jones's requested instruction referred to an "independent intervening cause" and that phrase was absent from the given instructions, the court still properly explained to the jury that if something unusual intervened, it would negate proximate causation. This is a simple and concise way of explaining an independent intervening cause in lay terms. Further, the jury was instructed that Jones's actions needed to be a "substantial factor"—meaning more than a trivial or remote factor—in causing Robinson's death. This too is a correct statement of law further informing the jury of the parameters surrounding proximate cause.

As for Jones's proposed instruction, it was potentially confusing and incomplete. Although it contained the *Lewis/Cervantes* hypothetical, that hypothetical is factually distinct and might incorrectly suggest that the withdrawal of life support was a suicide. Additionally, the proposed instruction used the term "independent intervening cause" without defining it. The proposed instruction also referenced consequences that "would not have *inevitably* followed" (italics added), instead of the pertinent inquiry of consequences a reasonable person would foresee. (See, e.g., *Cervantes, supra,* 26 Cal.4th at p. 871.) On the other hand, the given CALCRIM instructions captured the foreseeability concept by limiting liability to the "direct, natural,

---

[13] CALJIC No. 3.41 is substantially similar to relevant portions in CALCRIM Nos. 520 and 620; it provides in pertinent part: "There may be more than one cause of the (result of the crime). When the conduct of two or more persons contributes concurrently as a cause of the (result of the crime), the conduct of each is a cause of the (result of the crime) if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the (result of the crime) and acted with another cause to produce the (result of the crime)."

and probable consequence[s]" of Jones's actions, and by defining a "natural and probable consequence" as something "a reasonable person would know is likely to happen if nothing unusual intervenes."

For these reasons we find Jones failed to show error in the court's refusal of his pinpoint instruction, or that the jury was not properly instructed on intervening causation.

## C.     *Prosecutorial Misconduct*

Jones asserts the prosecutor committed prejudicial misconduct during closing argument when responding to the defense theory of independent intervening causation.  He claims the prosecutor improperly asserted that Jones's theory would result in two outcomes:  First, preventing murder prosecutions and convictions in cases involving a victim placed on life support; second, making Robinson's family and doctor criminally liable for Robinson's death.  According to Jones, this "forced the jury into false 'either or' decisions:  either convict Jones, or else other 'attackers' would walk free; either convict Jones, or else the family and doctor would be prosecuted." Finding it unlikely that the jury interpreted the prosecutor's argument in this manner, we see no error.

### 1.     *Additional Background*

During closing argument, Jones's counsel argued that the withdrawal of life support provided an independent intervening cause of death, insinuating that the family made that decision based on finances and their poor relationship with Robinson.  The prosecutor responded to that argument as follows:

> "Let's think about the logical implications of what the
> defense is arguing.  If someone is shot in the head or
> viciously beaten, like in this case, the victim's attacker

21

would never be responsible for the murder if the victim was taken off life support.

> "... That is not the law. It's plain wrong and it should be rejected. In fact, defense's position leads to even a more absurd result. So let's say that what they say is true, the family is the sole cause of the death. And then the perpetrator would be the 18-year-old son who is the next of kin that had to legally make the decision. Mr. Robinson, Mark Robinson, the brother who was also in agreement. Ms. Kacie Robinson, part of the family that made that decision. Dr. Schwendig would be an aider and abettor. That's [the] implication of the defense's argument."

Defense counsel objected to this argument as a misstatement of law, and the trial court admonished the jury to follow the court's instructions. The prosecutor continued, arguing that even if there was more than one cause of death, Jones's actions were still a substantial factor in Robinson's demise. She then characterized the defense theory as "absurd," "a red herring," "noise," "a distraction," and "smoke and mirrors," to which the trial court sustained defense counsel's improper argument objection.

2. *Discussion*

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument." (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Id*. at p. 667.) " '[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Ibid*.) We also presume " 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as

22

words spoken by an advocate in an attempt to persuade.' " (*People v. Morales* (2001) 25 Cal.4th 34, 47.)

In exploring the logical implications of the defense theory, the prosecutor said that relieving attackers of murder liability in cases involving withdrawal of life support would be "plain wrong," and placing liability on those involved in removing life support "leads to even a more absurd result." Because the prosecutor strongly criticized these potential outcomes, she implied law enforcement would not pursue action against the family or doctor. It is therefore not reasonably likely the jury understood the prosecutor's argument to mean that no one could be prosecuted for murder where a person is taken off life support. Nor is it reasonably likely jurors understood that now families and doctors could be held criminally liable in such a situation. Instead, it is far more likely that the jury understood the prosecutor was attacking the logic of the defense theory.

Additionally, immediately after the challenged portion of the prosecutor's argument, the trial court reminded the jury to follow its instructions on the law. In those instructions, the trial court told the jury not to let bias, sympathy, prejudice, or public opinion influence their decision; to make their decision based only on the evidence that has been presented at trial; that nothing the attorneys say is evidence; and to follow the court's instructions if they conflict with the attorneys' comments. We presume the jury followed these instructions. (*People v. Wilson* (2023) 89 Cal.App.5th 1006, 1014 [we presume the jury generally understands and follows the trial court's instructions].)

The record shows it is not reasonably likely the jury understood the prosecutor's argument in the manner suggested by Jones. Jones has therefore failed to establish error.[14]

## D. *Premeditation and Deliberation*

Claiming the evidence demonstrates he struck Robinson rashly, impulsively, and without careful consideration, Jones argues there was insufficient evidence of premeditation and deliberation. He contends there was no evidence of planning or motive, and the manner of the attack does not demonstrate premeditation and deliberation. We disagree because there was sufficient evidence of a preconceived intent to kill.

" ' "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*).) "Thus, ' "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264.) Additionally, " ' " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " ' " (*Mendoza*, at p. 1069.)

Three categories of evidence may inform the analysis of premeditation and deliberation: planning, motive, and manner of killing. (*People v. Lee*

---

14    Having found no prosecutorial misconduct or instructional error, we also reject Jones's claim of cumulative prejudice from these two issues.

(2011) 51 Cal.4th 620, 636.) " 'However, these factors are not exclusive, nor are they invariably determinative.' " (*Ibid*.) Instead, they simply guide our " ' " ' "assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." ' " ' " (*Ibid*.)

Our review of this issue is subject to the substantial evidence standard, under which we consider the record in the light most favorable to the judgment and determine whether the circumstances reasonably justify the jury's findings. (*Mendoza, supra,* 52 Cal.4th at pp. 1068–1069.)

Here, surveillance footage depicted Jones and Robinson walking in different directions when Jones decided to set down his bicycle, arm himself with a stick, and turn around to follow Robinson. As Robinson stopped and stood facing the other direction, Jones continued to walk directly toward Robinson, approaching Robinson from behind a parked car and immediately attacking him by surprise. Jones then walked away, slowly exiting the shopping center on his bicycle, and leaving Robinson unconscious and bleeding on the ground.

Based on this surveillance footage, it is reasonable to infer a planned killing as opposed to one due to a rash impulse. From the moment Jones turned around and began following Robinson with the stick, Jones appeared to be targeting Robinson. Indeed, bringing the murder weapon to the scene and acting surreptitiously indicates planning. (See, e.g., *People v. Lee, supra,* 51 Cal.4th at p. 636; *People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

As for the manner of the killing, Jones chose a sturdy blunt object and quickly directed four blows to the back of Robinson's head. The first of these blows was by surprise, while the final three were after Robinson went limp and was lying on the ground face down appearing unconscious. Jones also

25

maximized the force of his strikes, holding the stick with two hands each time, and raising the stick over his head while striking a prone Robinson. Because Jones targeted Robinson's head with repeated and severe blunt force by surprise and without any provocation, it is reasonable to infer a preconceived intent to kill. (See, e.g., *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [shooting victim in vital organs at close range supports finding of premeditation and deliberation]; *People v. Bloyd* (1987) 43 Cal.3d 333, 348 ["cold and calculated—execution-style killings" were "very strong evidence of deliberation and premeditation"]; *People v. Marks* (2003) 31 Cal.4th 197, 230 [close-range shooting without any provocation or struggle demonstrated premeditation and deliberation].)

While there was no evidence of motive, that is not a required element. Based on the manner of the killing and the evidence of planning, it is reasonable to infer that Jones's actions were the result of preexisting thought and reflection rather than an unconsidered impulse. Accordingly, there was sufficient evidence of premeditation and deliberation.

### E. *Motion to Reduce the Verdict*

Jones argues the trial court applied an incorrect legal standard when denying his motion to reduce the verdict under section 1181, subdivision (6). He claims the trial court improperly deferred to the jury's findings instead of independently reviewing the evidence. This claim is unsupported.

#### 1. *Additional Background*

After trial, Jones filed a motion to modify the verdict pursuant section 1181, subdivision (6). Based on his independent intervening causation theory, Jones sought to reduce the verdict to attempted murder. The People opposed the motion. Both parties submitted on their pleadings

26

when the trial court heard the matter.  The trial court stated:  "The jury made a [sic] independent finding that Mr. Jones was the person responsible for the harm that led to his eventual death.  I believe that's consistent with California and federal law and as a result of that, I'll deny the motion to set aside the jury's verdict in this case."

      2.    *Discussion*

When a verdict is contrary to law or the evidence, the trial court may modify it to a lesser included offense.  (§ 1181, subd. (6).)  In ruling on a motion under subdivision (6) of section 1181, "the trial court accords no evidentiary deference to the verdict."  (*People v. Carter* (2014) 227 Cal.App.4th 322, 327.)  " 'Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt to the judge, who sits, in effect, as a "13th juror." ' "  (*Ibid.*, italics omitted.)

We review the trial court's ruling under subdivision (6) of section 1181 for abuse of discretion.  (*People v. Carter, supra,* 227 Cal.App.4th at p. 328.)  Such an abuse occurs when the trial court applies the wrong legal standard.  (*Ibid.*)  However, trial court rulings are " 'presumed correct, and ambiguities are resolved in favor of affirmance.' "  (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069.)  We also "presume that the court 'knows and applies the correct statutory and case law.' "  (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

We addressed a claim analogous to Jones's in *People v. Price* (1992) 4 Cal.App.4th 1272.  In that case, the trial court denied a motion for a new trial by stating, "*I think the evidence was sufficient*, and I think that the jury—there was enough evidence there for the jury to do what the jury did."  (*Price*, at p. 1275, original italics omitted, italics added.)  Though not preferable, we found that the court's exercise of independent judgement was

reflected in the italicized portion of the quotation above. (*Id*. at pp. 1275–1276.)

Here, the trial court stated, "*I believe*" the jury's finding was "consistent with California and federal law." Similar to *Price*, the trial court's reference to its own beliefs suggests that it independently assessed the evidence. Additionally, the trial court was informed of the correct legal standard in both the moving and opposing briefs, which it confirmed reviewing.[15] At most, the trial court's statement was ambiguous, which we resolve in favor of an affirmance. Accordingly, Jones has failed to establish error regarding his motion to reduce the verdict.

---

[15] We disagree with Jones's contention that the People cited the incorrect substantial evidence standard of review in their opposition to the motion. The People cited the correct standard under the heading "STANDARD OF REVIEW," and merely asserted that substantial evidence supported the verdict.

## IV. DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.