Filed 12/15/25  P. v. Buchanan CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOHN EDWARD BUCHANAN,<br><br>    Defendant and Appellant. | 2d Crim. No. B337550<br>(Super. Ct. No. NA113460)<br>(Los Angeles County) |

John Edward Buchanan appeals his conviction, by jury, of the second degree murder of Jaynie Sauter.  (Pen. Code, § 187, subd. (a).)[1]  He was sentenced to state prison for 15 years to life.  He appeals contending the trial court erred because its instructions to the jury regarding implied malice and causation did not require the jury to find the act he committed involved a "high probability of death," and that death must have been foreseeable in order for it to have been the natural and probable

---

[1] All statutory references are to the Penal Code, unless otherwise stated.

consequence of his act. He further contends, and respondent correctly concedes, the abstract of judgment must be corrected to reflect the actual sentencing date and custody credits. We will direct the trial court to correct the abstract of judgment and, in all other respects, affirm.

*Facts*

Appellant and Jaynie Sauter lived together in an apartment in Long Beach. Sauter's friends, Cheryl Henjum and Bruce Gillies, lived in an apartment in the same neighborhood. On December 3, 2019, Sauter appeared at their apartment "in an alarmed state." She was "panicky and scared, frantic" and told Henjum she was "scared for her life." Sauter was having trouble getting her words out and seemed to be afraid that something would happen to her if she went home. Henjum and Sauter went shopping and Sauter seemed to calm down. When they got back to Henjum's apartment, however, Sauter became anxious again. She stayed with Henjum until late that night.

That evening, a group of Henjum and Gillies' friends were hanging out at their apartment. One of the women, Selwyn Powers, noticed that Sauter had a bad cut on her leg. Another guest, Angel Walkington, noticed that Sauter had a black eye that appeared to be a few days old. No one saw Sauter using alcohol or illegal drugs that night.

At one point, one of the guests accused Powers of stealing money. Gillies told her to leave. Powers gathered her things and left the apartment. She rode her bicycle down an alleyway behind the building in the direction of Sauter and appellant's apartment. As she was riding, Powers saw appellant. He asked her to come inside the apartment.

Appellant asked Powers if she knew where Sauter was. Powers told him. He left the apartment, taking Powers' bike with him. Powers stayed at the apartment because appellant had taken her bike and she had nowhere else to go.

Appellant arrived at Gillies' apartment shortly after Powers left. He was very angry and yelled at Sauter to go home. She got up immediately and left for the apartment. Appellant stayed behind to argue with Gillies.

When Sauter got to her apartment, she was upset to see Powers was there. Sauter was angry that Powers told appellant where she was, explaining, "'You know he beats me.'" Sauter insisted that Powers leave. She threw Powers' belongings outside. Powers left. Neighbors testified they were awakened by the sound of two women fighting.

Powers was homeless at the time. It was raining, so she took shelter under a carport across the alleyway from the back door to Sauter's and appellant's building. About 20 minutes later, appellant came back and went inside the building. Powers could hear appellant and Sauter fighting, although she could not hear exactly what they were saying. "I could hear them yell at each other. And then after, like, maybe like 20 minutes I started hearing [Sauter] screaming." After a while, Powers walked away because she "didn't know what else to do." The screaming was still going on. To Powers, "It sounded like somebody was getting hurt."

Sean Glynn spent that night sleeping in his truck which was parked outside of Gillies' apartment. The next morning, at about 7 a.m., he went inside. Sauter showed up at about 8 a.m. Glynn described her as "distressed, crying. [¶] She was – she was all, like, beat up or something. She was crying.

She was crying, holding herself . . . upset."  At some point, Glynn noticed that Sauter "had blood coming out of her ear, and then she had a large lump on the back of her head."  Sauter said that she had been fighting with appellant.  She said that "she was laying on the ground and he was standing over her and hitting her . . . striking her in a downward motion."  Sauter said she had been hit before, "but she's never been hit like that."  It was the hardest she had ever been hit.  Sauter was very scared.  Glynn got her a bag of frozen vegetables for her head.  After about an hour, Sauter calmed down and left the apartment.

Another friend of Sauter's, Angel Walkington, was living in a converted delivery truck that was parked in the same neighborhood.  Sauter showed up at the truck early on the morning of December 4.  She was wearing spandex pants, half a T-shirt, no shoes and no jacket.  Sauter was "hysterical.  Inconsolable."  It was also very difficult to understand Sauter.  "She was just all over the place.  She was just hysterical.  The night before she was still able to talk to us and was a lot calmer."  Sauter was slurring her words and having a hard time calming down to speak, but she told Walkington that "he kept hitting her."

It seemed to Walkington that Sauter could not catch her breath or calm down.  Eventually, she said she wanted to lie down and Walkington made space for her.  Sauter fell asleep but, "[s]he continued to breathe really erratically and funny.  She rolled around on the ground for hours crying, gagging, peeing on herself."  At about 5 p.m., Walkington noticed that Sauter had stopped making noise and was no longer breathing.  She called 911 and performed CPR while waiting for the paramedics to arrive.  While she was performing CPR, Walkington noticed that

4

Sauter had bruises on her face. Paramedics arrived and took Sauter to the hospital where she died a few days later, on December 7.

Appellant, meanwhile, spent December 4 with his friend Kristine Rodgers. At around 5 p.m., appellant received a text message from Walkington's boyfriend stating that Sauter was dead.[2] To Rodgers, appellant seemed "shocked and questioning." Appellant "broke down and started . . . kind of walking around in circles . . . ." He started crying and saying, "It can't be." Rodgers testified that appellant got down into the fetal position in the middle of the street. Eventually, appellant told Rodgers that he and Sauter had a fight that morning and he hit her with an open hand. While describing the fight, however, appellant gestured with a closed fist. At one point, appellant told Rodgers, "oh, my gosh. I might have . . . caused this, or something along those lines."

The coroner who performed the autopsy on Sauter testified that she died due to complications of a subdural hematoma. The autopsy also showed that Sauter had several traumatic injuries including bruises on her left jaw, both wrists and both thumbs. In addition to the subdural hematoma, Sauter had a soft tissue injury to her middle forehead. These injuries were caused by blunt force trauma to the head. The bruises on Sauter's head were consistent with multiple blows to the head, although even a single punch could have caused the bleeding that led to her death. Although it is theoretically possible these head injuries could have been caused by a fall, the coroner opined that her injuries were more consistent with having been hit.

---

[2] This information was incorrect. Sauter died on December 7, 2019.

The defense theory was that Sauter died of causes other than appellant hitting her. She may have gotten into a physical fight with Powers or another person that caused her fatal injuries. She could also have fallen after leaving the apartment the next morning. The defense also speculated that drugs or alcohol could have contributed to Sauter's death from blows that would otherwise not have been lethal.

A pharmacologist retained by the defense explained that, Sauter had fentanyl, methamphetamine and diazepam in her system before she was administered any medication at the hospital. Fentanyl and diazepam could cause confusion, sedation, a risk of falling and unconsciousness. Methamphetamine may cause a person to be very talkative, violent or paranoid. These substances were present in Sauter's blood at levels sufficient to trigger the side effects. The expert opined, however, that it is not possible to determine how much of any substance Sauter had taken in the 15 to 20 hours before her admission to the hospital.

*Contentions*

Appellant contends the trial court erred when it instructed the jury on implied malice and causation. He contends the jury should have been instructed that the natural and probable consequences of the act causing death must have been dangerous to human life in that the act involved "a high . . . probability that it would result in death." He further contends the jury should have been instructed that death must have been a foreseeable result of an act in order for death to be the natural and probable consequence of that act. The failure to include "high probability of death" and "foreseeability" in the instructions, appellant contends, deprived him of due process,

6

relieved the prosecution of its burden of proof, eliminated a valid defense to murder and directed a verdict on the issues most subject to reasonable doubt.  Additionally, the parties agree that the abstract of judgment in this matter reflects an incorrect sentencing date and incorrect custody credits.

*Standard of Review*

The trial court has an obligation to instruct the jury on all general principles of law relevant to the issues presented by the evidence.  (*People v. Souza* (2012) 54 Cal.4th 90, 115.)  We review de novo the question whether the trial court erred in its instructions.  (*People v. Parker* (2022) 13 Cal.5th 1, 66.)  In doing so, "we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner."  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)  If possible, we interpret the instructions to support the judgment rather than defeat it.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)  Even where an erroneous instruction has been included, we are required to reverse ""only when it appears the error was likely to have misled the jury.""  (*People v. Nelson* (2016) 1 Cal.5th 513, 546.)

*Discussion*

Instructions on Implied Malice.  Appellant was charged with second degree murder.  The trial court instructed the jury on the elements of this offense using CALCRIM No. 520. As relevant here, this instruction informs the jury that, "The defendant had *implied malice* if: 1. He intentionally committed the act [that caused the death of another person]; 2. The natural and probable consequences of the act were dangerous to human life; 3. At the time he acted, he knew his act was dangerous to

7

human life; AND 4. He deliberately acted with conscious disregard for human life."

About six months after appellant's trial, CALCRIM No. 520 was modified in light of *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*). The second element of its definition of implied malice now states, "The natural and probable consequences of the act were dangerous to human life in that the act involved a high degree of probability that it would result in death . . . ." (CALCRIM No. 520.) Appellant contends the trial court erred because its instructions did not require the jury to find that his act involved "a high degree of probability that it would result in death." There was no error.

As our Supreme Court has explained, "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra,* 14 Cal.5th at p. 988, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).) The act causing death "must not merely be dangerous to life in some vague or speculative sense; it must " 'involve[] a high degree of probability that it will result in death.' " ' " (*Reyes, supra,* at p. 989, quoting *Knoller, supra*, at p. 152.)

*People v. Nieto Benitez* (1992) 4 Cal.4th 91, explains that, historically, implied malice has been defined in two ways. Some courts explained that an act is committed with implied malice when it " 'involves a high degree of probability that it will result in death.' " (*Id.* at pp. 103-104.) Others held that an act is committed with implied malice where " " 'the natural consequences

of [the act] are dangerous to life . . . .'"'" (*Id.* at p. 104.) *Nieto Benitez* concluded these two formulations "actually articulated one and the same standard." (*Ibid.*) "[T]he two linguistic formulations – 'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*Id.* at p. 111.)

   *People v. Reyes, supra,* 14 Cal.5th 981 is not to the contrary. There, our Supreme Court held that a Penal Code section 1172.6 petition for resentencing should have been granted because there was insufficient evidence the defendant acted with implied malice when he traveled to rival gang territory with other gang members. The court concluded this conduct did not "by itself give rise to a high degree of probability that death will result." (*Reyes, supra,* at p. 989.) *Reyes* did not involve a claim of instructional error, did not disapprove *Nieto Benitez* and did not discuss the many opinions holding that "high probability of death" and "natural consequences dangerous to life" describe the same standard of implied malice. (See, e.g., *Knoller, supra,* at p. 152; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219; *People v. Watson* (1981) 30 Cal.3d 290, 300.)

   Appellant next contends the trial court erred when it failed to instruct the jury that "'[t]he death of another person must be foreseeable in order to be the natural and probable consequence of the defendant's act.'" (*People v. Gardner* (1995) 37 Cal.App.4th 473, 483 (*Gardner*).) There was no error because the trial court's instructions adequately explained the concept of a "natural and probable consequence."

   The trial court instructed the jury that appellant acted with implied malice if, among other things, "The natural

9

and probable consequences of the act [that caused Sauter's death] were dangerous to human life[.]"  (CALCRIM No. 520.)  The jury was further instructed, "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . .  [¶]  There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death.  A *substantial factor* is more than a trivial or remote factor.  However, it does not need to be the only factor that causes the death." (*Ibid*.)

        *People v. Autry* (1995) 37 Cal.App.4th 351, concluded that equivalently worded instructions "correctly embod[ied]" the causation element of second degree implied malice murder.  (*Id*. at pp. 362-363; see also *People v. Temple* (1993) 19 Cal.App.4th 1750, 1756.)  In *People v. Roberts* (1992) 2 Cal.4th 271 (*Roberts*), the trial court directed the jury "not to consider" whether death was a foreseeable result of the defendant's actions.  Our Supreme Court held the instruction "incorrectly stated the law of proximate cause.  A result cannot be the natural and probable cause of an act if the act was unforeseeable." (*Id*. at pp. 321-322.)

        Here, the trial court did not run afoul of *Roberts, supra,* or *Gardner, supra,* because it did not instruct the jury to ignore foreseeability.  To the contrary, the jury was instructed to determine whether Sauter's death was the "direct, natural and probable consequence" of appellant's act, a consequence "that a reasonable person would know is likely to happen if nothing unusual intervenes."  If a reasonable person would know that a result is likely to happen without some unusual intervention, that result is foreseeable.  The instruction adequately conveyed

10

the concept that Sauter's death could not be a "natural and probable consequence" of appellant's actions if her death was unforeseeable.

The jury was also required to find that appellant knew his act was dangerous to human life and that he acted with conscious disregard for that danger. If appellant knew his act was dangerous to human life, the likelihood that death would result from it was foreseeable to him. Similarly, if appellant consciously disregarded the danger his act posed to human life, he must have been subjectively aware that death was a foreseeable result of his actions. The instruction was not in error.

Instructions on Causation. With regard to causation, CALCRIM No. 520 provides, "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."

The trial court also instructed the jury regarding causation in terms of CALCRIM No. 620. This instruction informs the jury, "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. [¶] The failure of Jaynie Sauter or another person to

11

use reasonable care may have contributed to the death. But if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death even though Jaynie Sauter or another person may have failed to use reasonable care. [¶] Jaynie Sauter may have suffered from an illness or physical condition that made her more likely to die from the injury than the average person. The fact that Jaynie Sauter may have been more physically vulnerable is not a defense to murder or manslaughter. If the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death. This is true even if Jaynie Sauter would have died in a short time as a result of other causes or if another person of average health would not have died as a result of the defendant's action. [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty."

Appellant contends these instructions violated his rights to due process and trial by jury by eliminating a valid defense and by directing a guilty verdict so long as the jury found appellant's acts were a substantial factor in causing Sauter's death, even if her death was not a reasonably foreseeable or likely result of his actions. He contends the instructions erroneously informed the jury that appellant was "legally responsible" for Sauter's death if his act was a substantial factor in causing it, even if that result was unlikely. Instead, appellant contends, the trial court should have instructed the jury that the death of a person must be foreseeable in order to be the natural and probable consequence of the defendant's act. (*Gardner, supra,* 37 Cal.App.4th at p. 483.) There was no error.

12

First, as we have noted, there is no reasonable likelihood the jury found appellant guilty of murder without also finding that he was subjectively aware that Sauter's death was a foreseeable result of his act. CALCRIM No. 520 expressly requires that finding. (*Roberts, supra,* 2 Cal.4th at pp. 321-322.)

Second, there is no reasonable probability the jury found appellant's acts were the cause of Sauter's death without also finding that her death was reasonably foreseeable to appellant. CALCRIM No. 520 informs the jury that an act causes death if "the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes." CALCRIM No. 620 informs the jury that an act causes death "only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor." Consistent with these instructions, an act could not be a substantial factor in causing death, and that death could not be a natural and probable consequence of the act, if the death was unforeseeable. We conclude CALCRIM Nos. 520 and 620 correctly describe the causation element of second degree murder. (*People v. Catlin* (2001) 26 Cal.4th 81, 155; *People v. Jones* (2024) 105 Cal.App.5th 83, 99.)

Cumulative Error. Appellant contends the cumulative effect of the errors he has identified requires reversal. Here, there are no errors to cumulate. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 417.)

Ineffective Assistance of Counsel. Appellant contends his defense counsel was ineffective because counsel did not request that references to foreseeability and the high probability

13

of death be included in CALCRIM Nos. 520 and 620. To prevail on an ineffective assistance of counsel claim, appellant must establish, among other things, that "counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms . . . ." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058.) We grant trial counsel "wide latitude in deciding how best to represent a client," (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6), and for that reason, will reverse a conviction on this basis only if there could be no conceivable reason for counsel's acts or omissions. (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

Here, appellant cannot establish that he received ineffective assistance of trial counsel because the instructions at issue were not erroneous. Counsel could reasonably have decided not to request unnecessary modifications to the pattern instructions. (*People v. Memro* (1995) 11 Cal.4th 786, 834.)

Correction to Abstract of Judgment. The parties agree that the abstract of judgment must be corrected to reflect the actual sentencing date and to award appellant the appropriate number of custody credits. The original abstract of judgment states that appellant was sentenced on April 16, 2024 and awards him 1,584 days of custody credits. However, appellant was arrested on December 13, 2019 and sentenced on April 15, 2024. Both of those days must be included in the credit calculation. (*People v. Arevalo* (2018) 20 Cal.App.5th 821, 827; § 2900.5, subds. (a), (b).) Including those dates in the calculation, yields 1,586 days of custody credits. We will direct that the abstract of judgment be amended to correct this error.

14

*Conclusion*

We direct the Clerk of the Superior Court to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting a sentence date of April 15, 2024 awarding appellant 1,586 days of custody credit. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

YEGAN, Acting P. J.

We concur:

BALTODANO, J.

CODY, J.

15

Richard M. Goul, Judge

Superior Court County of Los Angeles

_____


Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Amanda V. Lopez, Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.